My name is Daryl Cochran and I represent Brendan McKown. We are the appellants in this case. With the 15 minutes I'll go ahead and just reserve the normal two minutes. We are appealing two summary judgment orders that have dismissed negligence claims that we have lodged against the Tacoma Mall property owner and a security company. The case arises out of a shooting that occurred back on November 20, 2005. Brendan McKown was shot multiple times and paralyzed after a and began shooting. The appeals arise out of claims which were, which echo in a failure to provide the necessary security to have prevented the injuries that Mr. McKown suffered. They were based on the two Washington Supreme Court cases which we felt from the beginning dictated the law in this area. A case called Nivens v. 7-Eleven Stores and Passaway v. Nordstrom. We modeled our two cases for two basic causes of action. First of all, that a property owner such as Simon Properties here has a duty to pay attention to a criminal past or an industry expectation for potential criminal conduct and provide necessary and reasonable safety measures to prevent foreseeable criminal behavior. There's a second and distinct cause of action or claim rather that is articulated in these cases and that is the duty to intervene when there's imminent criminal conduct that is actually occurring or the defendant or the property owner has reason to know should occur. So we did an extensive investigation before we filed suit and we determined that the Tacoma Mall had a long history of violent criminal conduct on its premises both in the mall and in the areas immediately surrounding the mall. And that criminal conduct included things such as knife assaults, many many physical gang-related assaults. There were shootings that were on the premises outside the mall or immediately adjacent to the mall. All of which informed the Tacoma Mall owner and security companies over many many years that they had to have basic security measures in place that were known not only to the Tacoma Mall folks but also industry-wide in terms of mall security. There's only a finite number of security measures that are generally understood to be necessary in terms of preventing criminal conduct. And what we found out as we look through the years of behavior at the Tacoma Mall was that the Tacoma Mall owner and security company knew what they were. They were to have security staff on place because they've created essentially its own city like ecosystem within the within the mall. So it knew that it had to have security staff to deal with criminal conduct. It knew that they had to be trained in how to stop and to interdict criminal behavior. It knew that it had to have a public address system so that if there were a major incident, for example gang fights, which had happened in years past on many many occasions, that they could announce to people, patrons within the mall, that they needed to avoid a certain area, that they needed to evacuate and to help people. Mr. Conklin, a thought occurred to me, perhaps you can answer this question. Is there any evidence that any of the measures which you have been discussing have ever prevented a type of shooting as occurred in this case? There is, Your Honor, and specifically in this case there are two experts who provided unrebutted testimony that the typical measures would have prevented this particular shooting. No, I didn't ask quite that question. I'm asking you whether there was any past practice that prevented this type of shooting anywhere in the United States. I think there is and I think it's I think it's shown by this case and I'll give the facts that indicate why. This mall and industries across in the mall industry across the nation know that one of the things it has to do is monitor its vacant hallways. I haven't put my question precisely enough. Is there an instance where security measures have prevented a seemingly mad random shooter from killing people at a mall? I don't know that we have it in the record. That's my question. Right, I don't we don't have that in the record here. Did you make a motion to amplify the record to put any such evidence before us? No, Your Honor, and I think the reason why that we wouldn't know about it is because they typically wouldn't become an issue that's either certainly a legal issue. So the answer is we don't have any precise example of a mall or any other public agency or private agency open to the public preventing a mad sharpshooter from killing randomly. We certainly do not have it on this record, but the evidence in this case showed that this particular mad shooter spent roughly 40 minutes at the mall carrying a large guitar case in a mall where there was no musical venue of any kind, that he was wearing a columbine-like trench coat as he walked through the mall, that he did his best in his own statements to make sure that he was caught during the roughly 40 minutes beforehand, and that he was actually in a vacant hall, which the mall knew it should have been monitoring. As I remember the record, he called 9-1-1 to announce that he was about to start shooting and told them, and when they asked his location, he said follow the screams, but that between that call and the actual shooting, there was not 40 minutes, there was one minute. Correct, and it's the 40 minutes which is the opportunity that the mall and the security company had to stop this, and it's what industry standard required them to have stopped. Because, and for example, let me get to this 10 minutes before he makes that call, Judge, because in the 10 minutes beforehand, he's at a vacant hallway within the mall, and he is loading two sets of automatic weapons out of his guitar case in plain view of people walking by. And the mall knew in past years, in fact we have memo after memo in the record, where they're saying, we know that based on the criminal experiences that we've had in the past, and based on industry standards, that we have to prevent criminal activity can happen, whether it's a rape, whether it's an assault, or whether it's someone loading their weapons. And they had this opportunity for 10 minutes to find the man loading his weapons, and 40 minutes in total as he wandered around the mall in what witnesses described as an ominous fashion. So when we talk about the security measures that should have been in place, they were there. And this is important because we've spent all of the briefs and a number of briefs going backwards and back and forth about whether we... Let me focus on this one for just a minute. So what measures should the mall have taken in this case? In this case, surveillance was number one. And that's human surveillance, or we're talking about monitoring by video? Both. So closed circuit television was industry standard, and by security guards who should have been on staff and in this area. So that's number one. And is there an industry standard? Is there a recommendation? Is there some kind of mall association that publishes guidelines for security? According to the unrebutted expert testimony in this case, there is. Okay, I'm sorry. The unrebutted expert testimony would be which one? From Robert Warrenma, and the pages would be 111 to 125, and William Nesbitt, pages 94. Okay, I have both of those. Which paragraph of the Nesbitt declaration, for example? I'm going to have to pull that up, and I don't have that right with me. I read those, and these guys are both private consultants, but I don't recall that either one of them referred to some kind of nationwide standards in the way that you would have, let's say, fire safety standards, or some other kind of regulatory body, even an industry body, that would say, here's the Mall Association of America, here's what we recommend as our safety, for safety. I can certainly bring that up on rebuttal and pinpoint the spots that are closed. And the reason that I ask is because let's assume that the mall understood that it had an obligation to monitor the halls, and an obligation both physically and by electronic means. What assurances do we have that that would have prevented this case? In other words, unless you post somebody in the hall all the times that the mall is open, that's different from having somebody walking the beat and passing by periodically. It might have prevented it, it might not have prevented it. And if you are successful here, we may be at a point where the mall will either have to close the hallways, or hire staff that may be prohibitive, or simply post magnetometers  I don't think that the result that we're looking for would have that effect. In fact, the experts and the evidence suggests that if there had been closed-circuit surveillance of the hallways, which is a fairly easy means to accomplish in terms of security measures, that they would have seen this assailant loading his two automatic weapons out of his good car case. If there had been a person watching that TV monitor all the time? If they would have had a security person who was responsible for monitoring the hallways, yes, absolutely. Did they have any electronic monitoring in the mall at all? They didn't, though their memo 15 days before the shooting indicated that it should be in place. That's one of the steps that they should have in place to protect the customers and protect the patrons who are there. Okay, do we have any cases from any other jurisdiction that deal with malls? Again, if we don't have an industry there, if we don't have an industry standard, and we don't have lawsuits being created on a one-by-one basis, I'm just wondering what obligation the mall has. Well, we don't have any appellate case that deals with a shooting such as this in a mall. We have a number of similar cases talking about violent crimes and the level of preparation and security measures. But I think your argument has to be that it isn't just that the mall should have anticipated somebody going after a soft target. That's the 911 argument, which seems to me a little extreme. It seems to me that your argument has to be, look, the Tacoma Mall is in a high-crime area. We know there's going to be stuff that's going to go on in the parking lots. There's stuff that's going to go on in the hallways, whether it's gangs, whether it's rapes, whether it's just simple robbery or shoplifting. And if the mall had had stuff, had had people in place to prevent those kinds of things, they would have picked up the big guy. That's precisely the argument. That is the argument. It has to be the argument, and you're exactly right. And that is the argument. There is not a single one of these measures that the Tacoma Mall would say, we had no reason to know that should have been in place. Because all of these basic security measures, like the surveillance with the closed-circuit television, the public address system, better-trained, better-sourced guards, all of it was known to the Tacoma Mall property owner and security company. And we know that because they had either had it in place and funded it at one point and then defunded it, or they were currently underfunding, such as the security guards, the number and the competency of, or they knew that they had to fund it. For example, the closed-circuit televisions and the public address system. They had everything that we would want them to be aware of from past incidents they knew about. Then, Mr. Cocker, let me ask you a question, and you'll have much more time. What if we were to certify this question to the Washington Supreme Court? How would your position be on that? I believe that the state Supreme Court would use its Nivens case and its Passivoy case to say that this was reasonably foreseeable, that there were sufficiently similar violent acts in the past that had put them on notice, that the Tacoma Mall and its owners did have the ability and the opportunity to make the necessary changes, and they didn't do it. And I would say, Your Honor, in particular on the issue of the duty to intervene, which got only limited treatment by the district court here, that certainly by the time he's loading his automatic weapons in the hallway, that the mall owner and security company had a responsibility to stop it, to prevent it. Were the mall guards armed? They were not, though they had armed guards in the past, and they defunded that program. I'll stop now with rebuttal time. Thank you. Okay, Mr. Keene. Good morning. May it please the Court, I'm Jeff Keene for Simon Property Group and IPC International Corporation. The plaintiff asks that a mall owner become the guarantor of the safety of its customers against the acts... Guarantor. Negligence, not guarantee. It's not a product defect case. I understand that. But in large part, if you weave your way through all of the plaintiff's arguments, I believe what they expect from the mall owner is a guarantee of safety from the acts of persons as deranged and as ill as Mr. Maldonado. Washington doesn't recognize that duty, nor is it reasonable to impose such a duty upon a mall owner. Washington has never recognized such a duty. What's wrong with asking the Supreme Court of Washington to decide that question by certifying? There's nothing wrong with it. I don't think it's a close question in terms of what basis there is for your decision, Your Honor, but there's certainly nothing in our view that would stop you from doing it, and there's no reason to not do it if you feel it's indicated. Since we think the existing law is clear, we don't think that it's warranted. Counsel, if I could interject. Of course. My concern about this case has been that we've got a Nivens case stating a broad general rule and adopting the restatement, which seems on its face to impose a general duty to protect invitees against reasonably foreseeable harm on the one hand, and we've got like three or four intermediate appellate court decisions that seem to stress a need to show a prior similar act, you know, on the property. And it seemed to me that there's some tension in what the intermediate appellate courts say and what Nivens said and the restatement language, so that asking the state Supreme Court to sort it out might be that we should give them the first chance. I'm not here to tell you you shouldn't or can't do that, Your Honor. I don't think that it's necessary, and it does. I think Nivens is a perfect illustration of the danger of dicta. If you read that and read it and reread it, Justice Talmadge wanted to write an opinion about a case that wasn't the one in front of him, and he went on and on and on and on, and when the case came back to home plate, what that case was about was are we going to impose upon a business owner an obligation to hire security guards, period? And the answer was no. And then when the question arose in the Supreme Court's mind about is this a case about foreseeability, at page 205 they explicitly say this is not a case about foreseeability. So I have a very difficult time squaring what Justice Talmadge was doing with what he needed to do to decide that case, and frankly I think he wanted to do more than that case allowed a platform to do. In the four appellate cases, five appellate cases decided since that time, none have followed anything like what he appeared to be arguing for in Nivens' case. In two of the four cases, excuse me, because Johnson was decided before Nivens, two of the four cases the Supreme Court denied review. So if they were having some difficulty with tension between the presentation of those appellate court cases and their rule in Nivens, they've already had two opportunities to do something about it and chose not to do it. But I think that this case, all of your questions, showcase what I think is the essential tension in this case, which is some realities. There are realities in our modern world that the plaintiff doesn't want to accept and they want to impose upon us the burden of somehow solving those realities. One of them is that Americans are armed in high volume. There are 250 million firearms in America. The simple fact is you can get a firearm if you want one in the United States. It was an interesting artifact of being involved in this case that after the assaults, the police locked down the place, and one by one the patrons left. Many, many of the patrons were armed in that mall. Now that's not how I go shopping. Including McCown. Of course. That's not how I go shopping. But many of the persons are armed, and we don't have any prohibitions or any restrictions on that. Another reality is we love our freedom. We want to go where we want to go when we want to go there without restriction. In fact, the Simon Property Group, frankly, would probably be out of business if we ran this mall like it was the West Bank. You can't come in unless you're frisked, unless you go through a metal detector, unless you have been vetted carefully so that you couldn't possibly arm or injure anybody with what you're armed with when you entered. And that is, I think, the essential tension in this case. Washington has joined the line of foreseeability, and not just foreseeability in the classic tort sense of, you know, if you put water on the floor of a POTUS department at a supermarket, are you liable when someone slips and falls in it? This requires foreseeability against criminal activity of a very, very unique kind. If the question is, should the mall have anticipated a guy walking into the mall and who starts shooting patrons randomly, I think the answer to that probably has to be no. I understand that's the plaintiff's 9-1-1 argument is after 9-1-1 anything goes. We're soft targets. We have terrorist activities and so forth. But why isn't it the argument, the one that I pressed to Mr. Cochran, that had the mall recognize that it was in a high-crime area, that it had areas of the mall in which it was more likely that criminal activity would take place, hallways, bathrooms, areas like that where you have a duty to sort of ensure that kids don't get raped on their way to the bathroom, that people don't get hijacked on their way to JCPenney's, and if they had had monitoring equipment to prevent rapes and shoplifting and assaults and knife fights and things like that, they might have picked up this guy. Well, that takes us down that trail of, you know, imaginary horribles and all of the solutions that we have in place against them, Your Honor. I mean, is it reasonable really to impose that upon a mall owner? We have to start from the predicate that we are expecting our citizens to follow the rules. There have been millions and millions and millions of patrons who have attended this mall over its existence. There had never been an incident even remotely like this. The closest in time criminal shooting event at the Tacoma Mall in the parking lot between people who knew each other was five years prior to this. So on the one hand, the contention is made that we should be surveilling all areas of the mall at all times against all activity, and the reality is you can't afford that. And the second reality is it isn't necessary because this is the crazed conduct of a madman who has continued to be a madman in prison, if Your Honor has followed the news. Mr. Keene, it seems to me that what you're saying is that a mall owner, unless there has been a similar shooting, has no duty to take preventive action, correct? Against this kind of activity. That's correct. This sounds like the old common law rule that a dog is entitled to his first bite. Well, I think when it comes to criminal conduct, Your Honor, the standard is much higher because you're imposing upon us the duty to protect these people against this crazy man. And we should have a much higher threshold when you want to impose that kind of rule. There would never be any liability for the first madman, but for the second madman there would be. Well, that is the rule that Washington State has embraced, Your Honor, because each of these cases has involved criminal conduct, and in each case the courts of appeals have said. When you use the word similar, how similar does it have to be? Is that a question of factors or a question of law? Well, I think in this case it's a question of law because the cases have required a very tight fit. The Greyhound case involved a shooting at a Greyhound station. There had been another shooting at the Greyhound station two years prior. Not racially motivated. Precisely. And so in that case the courts have said since this was a racially motivated shooting, we're not going to hold Greyhound liable for the shooting when it was different from the one that had happened before. Now it raises a different question if that had been a non-racially motivated shooting. Won't there always be some differences? I mean there will be different use of arms. There will be a madman who has some dislike of perhaps a movie that is being shown there at the mall or perhaps a person he doesn't like. So there always will be some dissimilarity. What is the basis of a court finding similarity sufficient to charge the landowner? Well, I think we need to draw a line somewhere between those things that I was talking about earlier, which is our freedom and our desire to let our citizens bear guns and imposing liability upon a business owner who is offering a public premises for all of those people to enjoy. Similarity. Give me the factors that we should consider in determining whether there is similarity or is not similarity. Is time one of them? Well, I think proximity of time has to be one of them. At least the courts seem to be suggesting that in Washington. A couple of years seems to be sort of the benchmark against which they measure similarity. The randomness of the conduct probably should be involved. The unpredictability of the conduct in terms of the general experience of humanity is probably part of the mix. Well, the restatement of torture, you take the position, of course, that 344 has not been adopted by Washington, right? Well, I don't know that I'd be that brazen, Your Honor. It's really hard to tell what that opinion means. And even if they did adopt it, if you look at the illustrations that they give to comment F, those illustrations bear out our point exactly. One of them involves overcrowding subway stations in Rush Hour. And the owner of the subway, knowing that people are going to overcrowd the platform and potentially there will be harm done because of that overcrowding. Well, that's a prior similar incident. The other one was the football crowd, known to be boisterous. They come in, they're boisterous. People get knocked off the platform because of their boisterousness. Again, similar prior conduct put the owner on notice. So even if you take 344 and you say it has been adopted and you look at those illustrations. But you're looking at the similarity of conduct which produces a result, not the similarity of the result. Not shooting versus shooting, but how the shooting occurred. That's not exactly what I understood 344 to be talking about. They're saying the question on foreseeability is, is the result foreseeable, not the particular manner in which it came about. Well, if that's your analysis, I respectfully disagree with you, Your Honor. I think that they're really looking exactly at the conduct and saying, is this like that? Is this thing here like the thing that we want to prohibit? Counsel, let me give you a hypothetical just from my sure I understand your position. Let's say on day one, crazy guy Maldonado shoots up the Tacoma Mall. And before that, no one had. Now let's say a week later, a group of terrorists go into the mall and start shooting it up. Would that be foreseeable because the crazy guy did it the week before? Or would that not be foreseeable because it's like a different type of shooter? That's an interesting question, Your Honor. And if you look at the Greyhound case, the answer would be those are two different events. But that's getting that line pretty close to each other, I'd have to agree. Terrorist-motivated shooting a week later, is that the same as a crazy single guy doing it for who knows what random reason? I would think not. And frankly, I think the precautions that you'd be talking about in the two different episodes are completely different. Frankly, I think you'd need armed guards and helicopters and who knows what kind of combat gear to deal with the terrorists. You might, although whether it was a crazy guy shooting up the mall on a solo venture or a coordinated terrorist attack or just like your old style, armed robbers who get out of control. Any of those would, if there was like a voice monitoring system so the mall could talk to the patrons, they'd be able to give them advice whether something was still going on or should they get out of there or keep their head low. Well, if I could just take that point on for a second, Your Honor. Your Honor, there's absolutely nothing in the record that suggests in any way that the absence of an intercom system had any effect on anything here. In fact, the shooting was pretty obvious to the patrons. People fled the sound of the shooting. Although the plaintiff has painted what Mr. McCowan was doing in a somewhat different light than I think the evidence indicates, Mr. McCowan certainly could have withdrawn. He certainly could have fled. Did McCowan testify, though, that if he had heard that the guy was still in the mall, he wouldn't have stepped outside of the shop he was in? He testified by affidavit subsequent to his deposition that that's what he would have done. At the time of his deposition, Your Honor, he had secreted himself in the store where he was. He had armed himself. He had his gun available, and frankly, he thought that he was going to be a hero that day. And Mr. McCowan is a nice man, and I certainly have no angst about him, but he actually put himself in harm's way because he thought he was going to accomplish something. He was the last person shot. Nobody knows what is in the mind of Mr. Maldonado because Mr. Maldonado, at the time of his deposition, chose not to speak about what happened or why he was doing what he did. Thank you. And back to the question about foreseeability, I think the Johnson v. Washington State University case is a good example of when the property owner does have an obligation to protect. In that case, there was a rape on the Wazoo campus, the 11th rape in a three-year period prior to the time that it occurred, along with 200 assaults during the same time period. There wasn't much discussion in the Johnson case about the basis upon which the court thought there was a question of fact, but that at least illustrates what would be a fair rule. Back to one other point that someone made. The high-crime area, Washington has said, and I think the Hutchins case has an interesting discussion of the dangerousness of saying that a property owner is liable if they operate a business in a high-crime area. If you're liable simply because a bad event occurs, because your business is located in a high-crime area, what kind of incentive are you giving the business owner to remain in that area? None. And that's exactly what the Supreme Court said in Hutchins. We don't want to use that as a basis for deciding upon landowner liability because we want to encourage landowners to remain in urban areas. I think you're out of time. I'm out of time and I'm out of things to say. I thank you for your attention. Very nice arguing. Okay, Mr. Cochran, I guess you get a minute and a half or so. Thank you, I appreciate it. The Washington Supreme Court case in Nimmins v. 7-11, I want to make sure that I address it because there was a suggestion in the briefs and even here that what the Supreme Court did, and particularly Justice Talmadge who penned the opinion, was just a matter of dicta. But Justice Talmadge wrote on behalf of the Supreme Court, the majority decided that they were going to use the case for the reasons that it did, to adopt Section 344 and delimit it by comments D and F. And that's not dicta. They used the case as their vehicle to give that holding, and that's precisely what they did. And within that opinion, within that holding, they recognized two essential components of the cause of action, the duty to intervene and the duty to foresee criminal conduct based on past experiences. So there are those two, and it's not a matter of dicta. That's Washington State Supreme Court law. And we would appreciate the opportunity to certify that to help the Washington courts make clear, in their own minds, including the intermediary courts, about those rules. As to the foreseeability issue, I just wanted to go back again and note that the purpose for the foreseeability rule, whether it's the general field of danger or the past experiences, is to give a property owner the opportunity to make changes to provide security. And here, whether it was a madman this week and terrorists the next week, based on the long history of criminal behavior that had happened in the mall, based on their knowledge of the criminality in the area and based on the industry standard, they knew what they should have done. They just either defunded it, underfunded it, or had, at that point, refused to fund it. And they should have. Thank you for your time. Okay, thank you. I want to congratulate counsel on both sides for excellent arguments. This is a very fascinating common law negligence case. Too bad we don't have Judge Cardozo sitting with us, but we'll do the best. Thank you. Thank you very much.
judges: Gould, Bybee, Bea